884 So.2d 1124 (2004)
Mary HARPER, as court-appointed guardian of Marilyn DALEY, Appellant,
v.
Steve L. TOLER, Eric Vaughn Toler, and Times Publishing Company, Appellees.
No. 2D03-694.
District Court of Appeal of Florida, Second District.
October 22, 2004.
*1127 Neal L. O'Toole and Joseph R. Kruk, III, of Law Office of Neal L. O'Toole, P.A., Bartow, for Appellant.
Bradley M. Bole of Rahdert, Steele, Bryan, Bole & Reynolds, P.A., St. Petersburg, for Appellee Times Publishing Company.
No Appearance for Appellees Steve L. Toler and Eric Vaughn Toler.
CANADY, Judge.
The plaintiff in a personal injury action appeals a final summary judgment in favor of the Times Publishing Company. The summary judgment was based on the trial court's determination that a substitute newspaper carrier  who was allegedly responsible for the injuries at issue  was as a matter of law not an employee of the Times. Because we conclude that the relevant facts did not justify the granting of summary judgment, we reverse.

I. BACKGROUND
This appeal arises from a personal injury action filed on the behalf of Marilyn Daley by her court-appointed guardian, Mary Harper, relating to an incident in which Ms. Daley was seriously injured and another person was killed when a vehicle driven by Eric Toler struck the two as they were walking on or along a road. The Times was sued because it was alleged that Eric Toler was acting at the time of the accident in the capacity of a "carrier helper." Eric Toler was serving as a substitute newspaper carrier for Robert Heller, a newspaper carrier for the Times. According to Heller's deposition testimony, he was required by the Times to have a carrier helper to carry out his responsibilities for the Times when he could not do so himself. Steve Toler, Eric Toler's father, who was himself a newspaper carrier for the Times, was added as a defendant because he owned the vehicle involved in the accident.
The depositions filed in the case indicated that Eric Toler had served in the capacity of a carrier helper for his father on numerous occasions. When Heller inquired of a manager employed by the Times as to who might be willing to serve as a carrier helper, the manager suggested Eric Toler. Heller subsequently asked Eric Toler to act as his carrier helper, and Eric Toler was serving in that capacity on the morning that the accident occurred. Deposition testimony revealed that Eric Toler was paid by Heller, not the Times, for his services as a carrier helper. There was no direct contractual relationship between Eric Toler and the Times.
In discovery, the Times produced the employment agreement of Steve Toler. Steve Toler's agreement with the Times *1128 was titled "Newspaper Carrier Sales-Staffer Employment Agreement" and was dated November 20, 1991. It set forth the terms of employment, including a provision that stated that the newspaper carrier "will deliver newspapers in the manner and at the time set by" the Times. It also listed a number of benefits that Steve Toler would be eligible to receive, including worker's compensation, unemployment insurance, a pension plan, profit sharing, "Carrier Accident Insurance," life insurance, disability insurance, and optional medical insurance. The agreement also had a specific provision requiring Steve Toler to have a "trained substitute to deliver the route in case of illness, vacation, or days off." Counsel for the Times conceded at oral argument that the agreement between Steve Toler and the Times established an employment relationship.
Harper unsuccessfully sought to obtain a written contract between the Times and Heller from the Times through discovery.[1] Heller's deposition testimony concerning his contractual relationship with the Times was equivocal. Heller became a carrier for the Times in August 2000. When asked if he had "some type of employment contract" with the Times, Heller responded: "I'm sure I did[,] ... but ... I can't tell you for sure." Heller was also asked: "Were you considered an independent contractor for [the Times]? In other words, would you have to pay the extra tax at the end of the year to Uncle Sam?" Heller responded: "Yeah, because I don't think any taxes  no taxes are taken out." Heller went on, however, to testify that "[t]here [was] a health plan" and "retirement type benefits" available to him from the Times. With respect to the benefits provided by the Times for carriers, the deposition testimony of Steve Toler indicated that the Times provided workers' compensation coverage for carriers injured on the job.
Harper and the Times filed cross-motions for summary judgment pertaining to whether Eric Toler was an employee of the Times or an independent contractor. The Times argued that the proper way to analyze the issue was to apply the ten factors in the Restatement (Second) of Agency section 220 to the relationship between Eric Toler and the Times, which it argued would lead to the conclusion that Eric Toler was an independent contractor. Among the arguments offered by Harper in opposition to summary judgment was that Eric Toler was a subemployee of the Times, which Harper asserted made a direct application of the Restatement factors to Eric Toler's relationship with the Times inappropriate.
In support of her motion for summary judgment against the Times, Harper contended that the facts were sufficient to determine that Eric Toler was an employee of the Times. Harper asserted that the facts showed the Times exercised sufficient control over its carriers and substitute carriers to support the legal conclusion that they were employees. Harper also relied on the terms of the employment agreement between the Times and Steve Toler as the basis for an inference that Heller had a similar agreement with the Times. Harper nonetheless acknowledged the "very difficult burden" imposed on the movant in summary judgment proceedings and that the "issue of control is typically resolved by the trier of fact."
The trial court granted the Times' motion for summary judgment, ruling that *1129 Eric Toler was an independent contractor. In reaching this conclusion, the trial court applied the ten factors in the Restatement section 220 directly to the relationship between Eric Toler and the Times. It did not address Harper's argument that Eric Toler was a subemployee of the Times.

II. ISSUES ON APPEAL
Harper first argues that Eric Toler was an employee of the Times. Harper argues in the alternative that "[t]he trial court erred when it granted [t]he Times' [m]otion for [s]ummary [j]udgment because at the very least genuine issues of material fact existed as to whether Eric Toler was an employee or an independent contractor of [t]he Times." In making both arguments, Harper contends that Eric Toler was a subemployee of the Times and that the trial court erroneously applied the Restatement factors directly to Eric Toler.
The Times argues that the trial court correctly applied the Restatement factors in determining that Eric Toler was not an employee. The Times also argues that Harper's motion for summary judgment, which was based on the contention that the undisputed facts established that the Times was vicariously liable for the negligence of Eric Toler, estops Harper from contending on appeal that the summary judgment in favor of the Times should be reversed because there were disputed issues of material fact.[2]

III. ANALYSIS
Summary final judgments are subject to de novo review. Volusia County v. Aberdeen at Ormond Beach, L.P., 760 So.2d 126, 130 (Fla.2000). "When reviewing a summary judgment, we must view the facts in the light most favorable to the nonmoving party." Garden St. Iron & Metal, Inc. v. Tanner, 789 So.2d 1148, 1149 (Fla. 2d DCA 2001). "[R]easonable inferences should be resolved against the movant." Villazon v. Prudential Health Care Plan, Inc., 843 So.2d 842, 853 (Fla.2003). In a negligence case, the de novo review of a summary judgment is guided by the principle that "[s]ummary judgments should be cautiously granted." Moore v. Morris, 475 So.2d 666, 668 (Fla.1985). A summary judgment should be affirmed only if the moving party has met the burden of conclusively proving the nonexistence of "genuine triable issues." Holl v. Talcott, 191 So.2d 40, 43 (Fla.1966). In other words, summary judgment is appropriate only when "`the facts are so crystallized that nothing remains but questions of law.'" Villazon, 843 So.2d at 853 (quoting Shaffran v. Holness, 93 So.2d 94, 97-98 (Fla.1957)); see also Yost v. Miami Transit Co., 66 So.2d 214, 216 (Fla.1953) ("In matters of summary judgment neither the trial court nor the appellate court is justified in weighing facts and meting out justice according to the conclusion reached. The procedure cannot be followed unless the facts are so crystallized that nought remains but a question of law."). "[I]t is well-established that the question of an employer/employee relationship is generally a question of fact, and therefore a question for the trier of fact." Pate v. Gilmore, 647 So.2d 235, 236 (Fla. 1st DCA 1994); see also Villazon, 843 So.2d at 853 ("The existence of an agency relationship is normally one for the trier of fact to decide.").
There are of course circumstances in which the undisputed facts will demonstrate the nonexistence of an employment relationship as a matter of law and thereby establish the proper basis for granting summary judgment. DeBolt v. Dep't of *1130 Health & Rehabilitative Servs., 427 So.2d 221, 226 (Fla. 1st DCA 1983) ("If there is no question as to the existence or non-existence of a master/servant or employer/employee relationship, the issue is one then for the court to determine."). Thus, if the only reasonable view of the evidence compels the conclusion that an employment relationship did not exist, a court may determine the issue as a matter of law. See Johnson v. Gourmet Gardens, Inc., 827 So.2d 1020, 1020 (Fla. 2d DCA 2002), review denied, 845 So.2d 890 (Fla.2003) (upholding summary judgment which was based on agency relationship where "the only reasonable inference a jury could draw from the uncontroverted facts" established the existence of the agency relationship).
In considering the Times' motion for summary judgment, the trial court determined that the dispositive issue was "whether Eric Toler, who had been asked by Robert Heller to take his newspaper route for a week, was an employee of [the Times] or whether he was an independent contractor." We agree that the critical issue here is whether an employment relationship existed. We conclude, however, that the trial court erred in its analysis of that issue. The fundamental flaw in the trial court's analysis stems from the trial court's failure to focus on the relationship between the Times and Heller and to apply the law regarding vicarious liability for subemployees.
The first step in analyzing the Times' potential vicarious liability is to determine whether Heller was an employee of the Times. The second step in the analysis is to determine whether Eric Toler was a subemployee. This second step only becomes pertinent if the first step of the analysis points to the conclusion that Heller may have been an employee of the Times. At both stages of the analysis, we are required to view the facts in the light most favorable to Harper. See Tanner, 789 So.2d at 1149.
To establish the proper legal framework for an analysis of the issue of the Times' vicarious liability, we will first review the law for determining whether an employment relationship exists. We will then turn to a discussion of liability for subemployees. Next, we will survey the case law which has applied the principles concerning the establishment of an employee relationship to newspaper carriers. We will then apply the pertinent legal principles to the facts presented by the instant case. Finally, we will address the Times' claim that Harper's cross-motion for summary judgment gave rise to an estoppel which precludes Harper's appeal.

Determining the Existence of an Employment Relationship
The Florida Supreme Court has adopted the test in the Restatement section 220 for determining whether an employment relationship exists. See Cantor v. Cochran, 184 So.2d 173 (Fla.1966); Miami Herald Publ'g Co. v. Kendall, 88 So.2d 276 (Fla.1956); Magarian v. S. Fruit Distribs., 146 Fla. 773, 1 So.2d 858 (Fla.1941); see also Kane Furniture Corp. v. Miranda, 506 So.2d 1061 (Fla. 2d DCA 1987). The Restatement sets forth a nonexclusive list of factors that are relevant to making the judgment whether a particular relationship is an employment (servant) relationship or an independent contractor relationship:
(1) A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control.
(2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:

*1131 (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
(b) whether or not the one employed is engaged in a distinct occupation or business;
(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
(d) the skill required in the particular occupation;
(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
(f) the length of time for which the person is employed;
(g) the method of payment, whether by the time or by the job;
(h) whether or not the work is a part of the regular business of the employer;
(I) whether or not the parties believe they are creating the relation of master and servant; and
(j) whether the principal is or is not in business.
The "extent of control" referred to in Restatement section 220(2)(a) has been recognized as the "most important factor in determining whether a person is an independent contractor or an employee." Kane Furniture, 506 So.2d at 1064. Of course, employees and independent contractors both are subject to some control by the person or entity hiring them. The extent of control exercised over the details of the work turns on whether the control is focused on simply the "result to be obtained" or extends to the "means to be employed." Farmers & Merchants Bank v. Vocelle, 106 So.2d 92, 95 (Fla. 1st DCA 1958). A control directed toward means is necessarily more extensive than a control directed toward results. Thus, the mere control of results points to an independent contractor relationship; the control of means points to an employment relationship. Furthermore, the relevant issue is "the extent of control which, by the agreement, the master may exercise over the details of the work." Restatement § 220(2)(a) (emphasis added). Thus, "[i]t is the right of control, not actual control or actual interference with the work, which is significant in distinguishing between an independent contractor and [an employee]." Vocelle, 106 So.2d at 95; see also Restatement § 220(1).
In addition to the factors enumerated in the Restatement, the "provision of employee benefits" has been recognized as a factor militating in favor of a conclusion that an employment relationship exists. Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 752, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989); see also Alexander v. Morton, 595 So.2d 1015, 1017 (Fla. 2d DCA 1992) (discussing absence of "any health or other insurance, pension or profit-sharing benefits" in evaluating whether employment relationship existed); Kane Furniture, 506 So.2d at 1066 (describing "the usual amenities associated with an employment relationship" as including "fringe benefits" and "health care insurance"); Moles v. Gotti, 433 So.2d 1380 (Fla. 2d DCA 1983) (reversing judgment determining that physician was not employee of clinic and remanding for new trial with directions that previously excluded evidence concerning absence of various fringe benefits, including health insurance and workers' compensation insurance, be admitted for consideration of jury on issue of employment relationship); F.T. Blount Funeral Home v. City of Tampa, 627 So.2d 1272, 1273 (Fla. 1st DCA 1993) (discussing absence of "any type of fringe benefits, such as health insurance" *1132 in reversal of trial court's determination that employment relationship existed); Delco Indus., Inc. v. Dep't of Labor & Employment Secur., 519 So.2d 1109, 1110 (Fla. 4th DCA 1988) (discussing absence of "any benefits of employment, such as worker's compensation, medical insurance, [and] pension plan" in case reversing trial court's determination that employment relationship existed).

Liability for Subemployees
Florida law also has long recognized the existence of subemployee or subservant relationships and the vicarious liability of an employer for the negligence of a subemployee or subservant. In Bucki v. Cone, 25 Fla. 1, 6 So. 160, 163-64 (1889) (quoting 1 Shear. & R. Neg. § 157), the supreme court explained the principle:
"The master is, of course, liable for the negligence of one whom his servant employs, by his authority, to aid such servant in the master's business. Such authority need not be express, but may be implied from the nature of the business, or the course of trade. Thus, such an authority would almost necessarily be implied in favor of a servant intrusted [...] with any task which could not be performed within a reasonable time by one man," and necessarily, also, in behalf of a servant employed in a business requiring the assistance of others.
Thus, an employer may be vicariously liable for the negligence of a subemployee even in the absence of an "express contractual relationship of master and servant" between them. Jacobi v. Claude Nolan, Inc., 122 So.2d 783, 787 (Fla. 1st DCA 1960).
The [employer/subemployee] relationship may arise by implication by the employment of a subservant by a servant to perform duties for the master, where the master has entrusted the servant with a task which cannot be performed by him within a reasonable time, where the business is of such a nature as to require the assistance of others, where there is an emergency, or where the authority to employ and use a subservant may be implied from the nature of the business or the course of trade. In these circumstances, the servant may employ a subservant to assist in the furtherance of the master's business, even though authority to hire the subservant has not been expressly given by the master. And under these conditions the master may be held liable for the tortious acts of the subservant, if they have been committed in the course of the employment.
Id. at 787-88. See also Coto v. Anipecu, Inc., 371 So.2d 183 (Fla. 3d DCA 1979) (holding that defendant in negligence action had failed conclusively to establish nonexistence of subservant relationship and was therefore not entitled to summary judgment); Gold Coast Parking, Inc. v. Brownlow, 362 So.2d 288 (Fla. 3d DCA 1978) (affirming verdict in favor of plaintiff where tortfeasor was subservant of defendant); cf. Higgins v. Investors Acceptance Co., 287 So.2d 724, 726 (Fla. 3d DCA 1974) (holding that "doctrine of respondeat superior ... does not apply ... when an employee hires a helper which his employer neither directed in fact, nor could be considered from the nature of the employment to have authorized or expected the employee to hire").
The Restatement also acknowledges the subservant relationship and sets forth the circumstances in which such a relationship arises as well as the liability consequences that flow from such a relationship. Restatement section 5(2) states:
A subservant is a person appointed by a servant empowered to do so, to perform functions undertaken by the servant for the master and subject to the control as *1133 to his physical conduct both by the master and by the servant, but for whose conduct the servant agrees with the principal to be primarily responsible.
The subservant relationship is not a common one, but it exists "where a person is paid by the piece or job and is allowed by the master to select assistants at his own expense, it being understood that the servant is to direct the conduct of the subservant who is to be subject also to the superior power of control which the master may exercise." Id. cmt. e.

The Status of Newspaper Carriers
Under Florida law, there are a number of cases in which newspaper carriers have as a matter of law been determined to be independent contractors. See Kendall, 88 So.2d at 279 (reversing judgment based on jury verdict for plaintiff and holding that "the extra-contractual activities of the contracting parties [did not] neutralize[] the provisions of the agreement which to us were obviously intended to make [newspaper carrier] an independent contractor"); Fla. Publ'g Co. v. Lourcey, 141 Fla. 767, 193 So. 847, 848 (1940) (reversing judgment based on jury verdict for plaintiff and holding that newspaper carrier was independent contractor where contract described his position as that of an independent contractor and he "was subject to the will of the corporation only as to results of his work and ... was permitted to perform it according to his own methods"); King v. Hall, 740 So.2d 1241, 1243 (Fla. 3d DCA 1999) (affirming summary judgment in favor of newspaper, which was based on trial court's determination that the case was "`indistinguishable'" from Kendall); Marcoux v. Circle K Stores, Inc., 773 So.2d 1270, 1271 (Fla. 4th DCA 2000) (relying on King to support affirmance of summary judgment in favor of newspaper); Walker v. Palm Beach Newspapers, Inc., 561 So.2d 1198, 1199 (Fla. 5th DCA 1990) (affirming directed verdict in favor of newspaper, which was based on determination that carrier was an independent contractor and stating that case was "factually analogous" to Kendall); Howard v. Shirmer, 334 So.2d 103, 104 (Fla. 3d DCA 1976) (affirming summary judgment in favor of newspaper, which was based on conclusion that carrier under "Independent Newsdealer's Contract" was an independent contractor).
There is, however, no "conclusive" or "ironclad presumption" that newspaper carriers are independent contractors. Keith v. News & Sun Sentinel Co., 667 So.2d 167, 170 (Fla.1995). On the contrary, whether a particular newspaper carrier is an employee or an independent contractor depends on the particular relationship the carrier has with the newspaper. In determining whether an employment or independent contractor relationship exists, "`the facts peculiar to each case govern the decision.'" Id. (quoting Kendall, 88 So.2d at 278).
The relevant "facts peculiar to each case" are the facts concerning the contractual agreement between the parties, as well as the course of the parties' conduct under the agreement.
[C]ourts should initially look to the agreement between the parties, if there is one, and honor that agreement, unless other provisions of the agreement, or the parties' actual practice, demonstrate that it is not a valid indicator of status. In the event that there is no express agreement and the intent of the parties cannot otherwise be determined, courts must resort to a fact-specific analysis under the Restatement based on the actual practice of the parties. Further, where other provisions of an agreement, or the actual practice of the parties, belie the creation of the status agreed to *1134 by the parties, the actual practice and relationship of the parties should control.
Keith, 667 So.2d at 171.
In all of the reported cases where the status of a newspaper carrier with a newspaper has been determined as a matter of law to be an independent contractor relationship, there has been a written contract in which the carrier was described as an independent contractor. Of course, the existence of such a written "independent contractor contract" is neither necessary nor sufficient to support a conclusion that as a matter of law there is an independent contractor relationship. But the existence of such a contract makes it more likely that the undisputed facts will establish that an independent contractor relationship exists.

The Relationship Between the Times and Eric Toler
In applying the pertinent legal principles to the instant case, we must first determine whether the undisputed facts  when viewed in the light most favorable to Harper  show as a matter of law that Heller was not an employee of the Times. Unless the facts show conclusively that Heller was not an employee, Harper is entitled to have the liability of the Times analyzed for purposes of the Times' motion for summary judgment based on the assumption that Heller was an employee of the Times. The record does not contain any written contract between the Times and Heller. And Heller's deposition testimony concerning his contract with the Times  along with the other testimony before the trial court  is not sufficient to establish as a matter of law that he was not an employee. Heller's testimony concerning the availability to him from the Times of health and retirement benefits is a significant  although not necessarily dispositive  factor indicating the existence of an employment relationship. See Alexander, 595 So.2d at 1017; Kane Furniture, 506 So.2d at 1066; Moles, 433 So.2d 1380; F.T. Blount Funeral Home, 627 So.2d at 1273; Delco, 519 So.2d at 1110. Steve Toler's deposition testimony that the Times offered workers' compensation benefits to its employees also would support the existence of an employment relationship. See Moles; Delco, 519 So.2d at 1110. In addition, the record does not conclusively show that the Times' right of control over Heller did not extend to the means used by Heller in performing his duties for the Times. See Vocelle, 106 So.2d at 95. In light of these facts, the record does not establish that Heller was not an employee of the Times.
The analysis then necessarily moves to this question: Did the Times establish conclusively that Eric Toler was not a subemployee? A negative answer to that question flows from the Times' failure to show conclusively that Eric Toler was not employed by Heller  under the authority of the Times  to aid Heller in the Times' business. See Bucki, 6 So. at 163-64; Jacobi, 122 So.2d at 787. Indeed, the testimony of Heller supports the conclusion that the Times specifically required that Heller have a substitute carrier to perform Heller's duties for the Times when he could not do so himself. Moreover, the record does not establish conclusively that Eric Toler was not subject to the requisite right of control of both Heller and the Times. See Restatement § 5(2).
The trial court's analysis of the relationship between the Times and Eric Toler based on the factors of Restatement section 220 was erroneous. In applying the Restatement factors directly to Eric Toler, the trial court made two analytical errors. First, the trial court misapplied the Restatement factors directly to a person who *1135 had no direct contractual relationship with the Times. Second, the trial court disregarded the pertinent legal principles governing employer liability for subemployees.
Restatement section 220, in discussing "whether one acting for another" is an employee or independent contractor, assumes the existence of a contractual relationship  that is, a contractual relationship between the one acting and the person for whom the action is undertaken. Where a subemployment relationship exists there will be no direct contractual relationship between the subemployee and the employer. In such cases, the pertinent contractual relationship to be evaluated under Restatement section 220 is the relationship between the employer and the employee.
Here, for purposes of the summary judgment analysis we are required to assume that Eric Toler (a) had no contractual relationship with the Times and (b) had a relationship with Heller that met the requirements for subemployment status. Eric Toler's status thus depended on the status of Heller. For purposes of determining the vicarious liability of the Times, Eric Toler stepped into the shoes of Heller. In deciding whether the basis for vicarious liability existed, the trial court thus should have applied the Restatement factors  and other pertinent factors  not to the relationship between the Times and Eric Toler but to the relationship between the Times and Heller. The trial court effectively failed to recognize the lack of a direct contractual relationship between Eric Toler and the Times. And the trial court failed to follow the body of Florida law regarding liability for subemployees.[3]
Harper ultimately has the burden of establishing at trial that the Times was vicariously liable for the conduct of Eric Toler. But on the motion of the Times for summary judgment the Times had the burden of establishing the absence of any disputed issues of fact material to the issue of vicarious liability. The Times failed to establish conclusively either that (a) Heller was not an employee or that (b) Eric Toler was not a subemployee. The Times thus failed to meet the burden it was required to meet to be entitled to judgment as a matter of law.

Estoppel on Appeal
Harper is not estopped to argue on appeal that there were disputed issues of material fact which precluded summary judgment. It is true that a party may not ordinarily take one position in proceedings at the trial level and then take an inconsistent position on appeal. See Reserve Ins. Co. v. Pollock, 270 So.2d 469, 469 (Fla. 3d DCA 1972) (holding that defendant-appellant which "admitted its liability" under insurance policy was "estopped from taking an inconsistent position" on appeal). But the mere fact that Harper moved for summary judgment and *1136 thereby asserted that there were no disputed issues of material fact does not preclude her from appealing the summary judgment entered in favor of the Times. As the supreme court stated in West Shore Restaurant Corp. v. Turk, 101 So.2d 123, 126 (Fla.1958):
[W]e [dis]agree with defendants that the plaintiff is estopped to complain of the summary decree against it since it also had moved for summary decree. To follow this reasoning would mean that one who made such a motion would be precluded from contesting the correctness of any adverse order entered against him as a result thereof.
A party may move for summary judgment based on a particular theory of the case  relying on certain facts, inferences, and legal principles  and without taking an inconsistent position subsequently challenge on appeal the trial court's determination that there were no disputed issues of material fact and that the adverse party was entitled to judgment as a matter of law. See Floyd v. Homes Beautiful Constr. Co., 710 So.2d 177, 179 n. 1 (Fla. 1st DCA 1998) (holding that appellants against whom summary judgment was entered were "not taking a position on appeal inconsistent with the one taken in their motion for partial summary judgment").
An estoppel may arise when a party has "assert[ed] that there was no genuine issue of fact on a specific question and then on appeal take[n] the contrary position that there was a material issue of fact on the same question." Wilson v. Milligan, 147 So.2d 618, 622 (Fla. 2d DCA 1962) (emphasis added). It is true that Harper both (a) asserted in the summary judgment proceedings that there were no disputed issues of material fact on the general question of the existence of an employment relationship that would be the basis for imposing vicarious liability on the Times and (b) now asserts on appeal that there are disputed issues of material fact on that same general question. But Harper's position on appeal is in no way contrary to the position she took in the earlier proceedings with respect to the specific facts, inferences, and legal principles on which she has relied. In the absence of the assertion by Harper of such a contrary position on a specific question no estoppel is operative against Harper.

IV. CONCLUSION
The summary judgment in favor of the Times is reversed, and the case is remanded for further proceedings.
Reversed and remanded.
FULMER and CASANUEVA, JJ., concur.
NOTES
[1] The record reflects that it was the practice of the Times to enter written contracts with its carriers. It is unclear from the record before us why a written contract between the Times and Heller was never produced.
[2] The question of whether Eric Toler was acting within the scope of his duties as a substitute newspaper carrier when the accident occurred is not at issue in this appeal.
[3] We acknowledge that the trial court's error in this regard is understandable in light of certain statements contained in our decision in Kane Furniture, where we discussed the direct application of the Restatement factors to an alleged subemployee. We conclude, however, that the court's discussion of that issue was dicta. The court's discussion in Kane Furniture, 506 So.2d at 1066, concerning the analysis it would apply to the relationship between the defendant and the alleged subemployee if the alleged employee were not an independent contractor was a comment on a hypothetical circumstance and not necessary to the court's decision of the case. In addition, at no point in Kane Furniture did the court address the argument  which has been presented in the instant case  that it is inappropriate to apply the Restatement factors directly to an alleged subemployee. For these reasons, the statements in Kane Furniture concerning the direct application of the Restatement factors to a subemployee do not afford any guidance for the resolution of the present case.